UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-mj-01010-RN-1

**United States of America**,

v.

**Richard B. Cary, III**,

        Defendant.

**Judgment**

On January 7, 2015, the Government filed a Criminal Information against Defendant Richard B. Cary, III, that charged him violating North Carolina General Statute § 20-138.1, driving while impaired ("DWI"), as assimilated by 18 U.S.C. § 13(a). The undersigned magistrate judge conducted a bench trial on September 21, 2015. After reviewing the entire record, considering all of the testimony, reading each exhibit, and assessing the credibility of the witnesses, the court enters the following findings of fact and conclusions of law.[1] As explained below, the court finds that the Government failed to establish beyond a reasonable doubt that Cary was under the influence of an impairing substance while driving his vehicle. Because the Government has not met its burden of proof, the court adjudges Cary not guilty of the sole count of the Criminal Information.

**I.     Background**

On the evening of June 26, 2014, at the conclusion of a day that had begun at 4:30 a.m. (Tr. at 92:25–93:6), Defendant Richard B. Cary, III, and Michael Byars decided to have dinner and watch baseball at a local restaurant. *Id.* at 83:1-2, 109–9:11. As they had done a number of

---

[1] To the extent any finding of fact should be designated as a conclusion of law, it should be considered a conclusion of law. Similarly, to the extent any conclusion of law should be designated a finding of fact, it should be considered a finding of fact.

times before, prior to heading out, they decided who would be the designated driver. *Id.* at 109:16–22. On this particular night, Cary agreed to be the designated driver. *Id.* at 81:3–13. Between 6:30 p.m. and 8:00 p.m., Cary consumed two beers and ate his dinner. *Id.* After those two beers, Cary drank water until he and Byars left the restaurant at shortly before 1:30 a.m. *Id.* at 26:11–13, 82:19–83:7. Byars's testimony corroborates Cary's version of events. *Id.* at 112:3-8

After leaving the restaurant, Cary drove his vehicle back towards his residence at Fort Bragg. *Id.* at 80:2–9. In order to gain access to Fort Bragg, Cary had to drive through ACP-5, also known as the All American Gate. *Id.* at 5:6–7:10. At the gate, SPC Paul Heath, a Gate Guard, picked Cary's vehicle for a random vehicle search. *Id.* As part of the search, Cary handed over his driver's license, military identification, registration, and proof of insurance. *Id.* at 9:10–11. He also exited the car and aided the search by opening the doors of the car and opening a suitcase located in the trunk of the car. *Id.* at 85:9–25. He did all of these things without difficulty. *Id.* at 17:9–11, 21:13–17.

While he was conducting the search, Heath noticed that Cary smelled of alcohol. *Id.* at 11:18–19. However, Heath's notes do not indicate that there was a strong smell of alcohol. *Id.* at 14:12–15:7. He called Military Police to investigate the possibility of a DWI and SPC David Morales responded to the dispatch. *Id.* at 26:16–18.

Morales, after observing that Cary smelled of alcohol, had bloodshot (but not glassy, *id.* at 49:3–8) eyes, and had slurred speech, asked Cary if he had consumed any alcohol prior to driving. *Id.* at 29:6–17. Cary replied that he had two beers between the approximate times of 6:30 p.m. and 8:00 p.m. *Id.* at 81:6–7, 112:6–8. Morales then conducted a portable breath test

2

("PBT") which, after some initial difficulty obtaining a sample, was positive for the presence of alcohol. *Id.* at 29:23–25.

As Morales was administering the PBT, a sergeant approached Byars and questioned him about Cary's alcohol consumption. *Id.* at 117:5–8. Byars told the sergeant that Cary had beer with dinner, but had not had anything to drink for approximately five hours. *Id.* at 118:8–11. When the sergeant insisted that Byars tell him the truth about Cary's actions earlier that evening, Byars maintained that he was telling the truth. *Id.* at 118:11–18.

After completing the PBT, Morales conducted two Standard Field Sobriety Tests ("SFSTs"): the walk-and-turn test and the one-leg test. Before completing the walk-and-turn test, Cary told Morales multiple times that he had an injured hip. *Id.* at 88:1–16. Although Morales told Cary that he would note the injury in his report (*id.*), the report did not mention the injury.

Morales then instructed Cary on how to complete the walk-and-turn test. *Id.* at 38:23–25. The walk and turn test consists of an individual taking nine heel-to-toe steps in a straight line, turning around in a prescribed manner, and then taking nine additional heel-to-toe steps in a straight line. *Id.* at 39:5–10. The individual is to count the steps out loud and look down at his or her feet while performing these tasks. *Id.* The officer administering the test is looking for a series of clues that would indicate the individual performing the test is intoxicated. These clues include swaying, using hands for balance, not counting out loud, not looking at their feet, or stepping off the line. *Id.* at 40:21–41:1. Morales asserts that Cary missed one heel-to-toe step, stepped off the straight line when taking his first three steps, did a military-style "about face" turn instead of turning around in the correct manner, and stopped counting. *Id.* at 41:19–42:13.

However, Cary takes issue with two specific aspects of Morales's instruction and administration of the test. First, Cary notes that the National Highway Traffic Safety

3

Administration teaches that an individual should be instructed to walk along a designated line when completing the walk and turn test. *Id.* at 53:7–122. However, in this case, Morales did not instruct Cary to walk along a designated line. *Id.* at 53:23–25. Instead, Cary was required to walk a straight line that he visualized on his own. *Id.* at 54:1–2. Similarly, Morales visualized his own straight line and attempted to assess whether Cary was walking on this line. *Id.* at 54:7–15.

Second, Cary takes issue with Morales's assessment that he did not properly turn around after completing the first nine steps. Cary admits that he turned around in an "about face" fashion (*id.* at 88:18–24), but he claims, and Byars confirms, that Morales never instructed him on the proper manner to conduct the turn (*id.* at 88:18–23, 116:13–16). Morales testified that he did not specifically remember instructing Cary on how to perform the turn. *Id.* at 58:1–4.

After completing the walk and turn test, Morales administered the one-leg stand test. *Id.* at 43:11–18. This test involves an individual standing with his hands at his sides and raising one leg six inches off the ground while counting out loud. *Id.* at 43:19–24. The individual must keep his legs straight and his toe pointed while performing the test. *Id.* The officer administering this test is looking for a lack of balance, swaying, putting the foot down, hopping, or a general inability to perform the test. *Id.* at 44:8–12.

Before completing the one-leg test, Cary again informed Morales multiple times of his injured hip, but the injury was not noted in the report. *Id.* at 88:1–16, 89:6–10. Despite this fact, Cary performed this test while standing on the leg connected to his injured hip. *Id.* at 89:14–20. When Cary started the test, his raised foot was pointed up (*id.* at 88:25–89:2), and he moved that foot to point down when told to do so by Morales (*id.* at 116:23–117:1). During the test, he put his foot down two times, swayed, and hopped twice. *Id.* at 45:8–14.

4

Based upon Cary's performance on the SFSTs, the results of the PBT, and his observations of Cary, Morales believed that Cary had consumed a sufficient amount of alcohol to impair his mental or physical faculties. *Id.* at 46:2–19. Morales arrested Cary and transported him to the police station. *Id.* at 46:20–21. There, Officer Troy Looney, a civilian police investigator, advised Cary of the North Carolina implied consent provisions and asked him if he would provide a breath sample for a breathalyzer test. *Id.* at 71:21–22, 75:1–3. Cary refused (*id.* at 75:6–7) because he thought he needed the presence of a lawyer for the administration of the breathalyzer (*id.* at 92:14–16).

Subsequently, the Government filed a Criminal Information against Cary, charging him with a violation of 18 U.S.C. § 13, assimilating North Carolina General Statute §20-138.1, which prohibits a person from operating a motor vehicle upon a street, highway, or public vehicular area while under the influence of an impairing substance and/or after having consumed sufficient alcohol that he/she had, at a relevant time after driving, a blood alcohol concentration of 0.08% or more.

## II. Analysis

### A. Overview of the Charged Offense

Cary is charged with violating North Carolina General Statute § 20-138.1 ("DWI"), which provides in relevant part that "[a] person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State … [w]hile under the influence of an impairing substance." N.C. Gen. Stat. § 20-138.1(a)(1). Although a violation of § 20-138.1 is a state law crime, Cary is charged with a federal crime through the Assimilative Crimes Act, 18 U.S.C. § 13. Under the Assimilative Crimes Act, those who commit criminal acts on federal reservations are subject to prosecution under state law if

there is no applicable federal law specifically prohibiting the criminal conduct. *United States v. Minger*, 976 F.2d 185, 187 (4th Cir. 1992). When a state law is assimilated under the Assimilative Crimes Act, federal courts look to state law for the elements of the crime. *Id.* However, the federal law of evidence, not state law of evidence, governs the proceeding. *United States v. Van Hazel*, 468 F. Supp. 2d 792, 798 (E.D.N.C. 2006).

In order to prove Cary guilty of DWI, the Government must establish three elements beyond a reasonable doubt: (1) Cary was driving a vehicle, (2) he was driving that vehicle upon a street, highway, or public vehicular area on Fort Bragg Military Reservation, an area within the special maritime and territorial jurisdiction of the United States, and (3) at the time he was driving the vehicle, he was under the influence of an impairing substance. *See* N.C. Gen. Stat. § 20-138.1(a)(1); N.C.P.J.-Crim. 270.20A (2014); *see also* 18 U.S.C. § 13(a). Only the third element—that Cary was under the influence of an impairing substance—is in dispute. Tr. at 8:17–9:1 (taking judicial notice that the events at issue in the trial occurred in the special maritime and territorial jurisdiction of the United States); 80:4–9 (admission by Cary that he was driving the vehicle at issue on the night in question).

A person is under the influence of an impairing substance when he takes or consumes "a sufficient quantity" of an impairing substance such that there is "an appreciable impairment" of his mental or bodily faculties. N.C.P.J.-Crim. 270.20A (2014); *see also* N.C. Gen. Stat. § 20-4.01(48b). An impairing substance includes alcohol. N.C. Gen. Stat. § 20-4.01(14a). "The fact that a motorist has been drinking, when considered in connection with faulty driving or other conduct indicating an impairment of physical and mental faculties, is sufficient *prima facie*" to show appreciable impairment. *State v. Norton*, 231 N.C. App. 75, 79, 712 S.E.2d 387, 390

6

(2011) (internal quotation marks omitted) (quoting *State v. Coffey*, 189 N.C. App. 382, 387, 658 S.E.2d 73, 76 (2008)).

B.  **Discussion of Evidence Presented at Trial**

As discussed in more detail below, although there is some evidence that Cary was under the influence of an impairing substance on the night in question, there is insufficient evidence to establish this element beyond a reasonable doubt. In light of the credible testimony regarding Cary's alcohol consumption, Cary's interaction with gate personnel, and the manner in which the field sobriety tests were administered, there is reasonable doubt as to whether his physical or mental facilities were appreciably impaired when he returned to Fort Bragg. As a result, the court will find Cary not guilty of the sole count of the Criminal Information.

First, Cary presented substantial, credible evidence regarding his alcohol consumption on the evening in question. Cary has consistently maintained that he only consumed two beers at dinner and that he did not consume any alcohol between 8:00 p.m. and the time he returned to Fort Bragg, approximately 1:30 a.m. His version of events is corroborated by the testimony of Byars. Additionally, Byars testified that he relayed the same information to a superior officer on the night in question. The Government failed to present any evidence— such as a receipt from the restaurant in question— or to elicit any testimony to challenge Cary's statements regarding his alcohol consumption.

Moreover, Cary's initial interactions with the gate personnel at Fort Bragg support a finding that he was not appreciably impaired by alcohol on the night in question. The evidence shows that Cary was able to operate his vehicle without any noticeable difficulty. He had no issues providing his driver's license, military identification, registration, and proof of insurance

7

to gate personnel and was able to exit his vehicle, open the doors of his car, and open a suitcase without showing any signs of appreciable impairment.

The observations of Cary at this time provide some support for the argument that he consumed alcohol, but do not necessarily demonstrate appreciable impairment. For example, although SPC Heath indicated that he smelled alcohol on Cary's breath, he did not note a strong odor of alcohol. Similarly, although Cary had bloodshot eyes, something not unexpected after being awake for over 20 hours, there was no indication that Cary's eyes were glassy. However, Cary did not provide any explanation for SPC Morales's assessment that his speech was slurred.

Due to the manner in which they were administered, the results of the SFSTs also provide only limited support for the Government's case. On the walk-and-turn test, SPC Morales testified that Cary missed heel to toe once, stepped off the line three times, did not turn around in the prescribed manner, and stopped counting. Tr. at 41:19–42:13. However, the officer's assessment that Cary stepped off the line is of limited utility because there was no designated line used to assess whether Cary was following a straight line. Setting aside that issue, it appears that after stepping off of the line for the first three steps, he successfully walked a straight line for the remaining fifteen steps. The Government has not offered any evidence that would help the court determine whether missing 1 of 18 heel-to-toe steps and failing to walk in a straight line for 3 out of 18 steps constitutes evidence beyond a reasonable doubt of appreciable impairment.

Moreover, although the Government claims that the manner in which Cary completed his turn at the end of his first nine steps demonstrates impairment, the evidence establishes that Cary was not given specific instructions on how to complete the turn. In the absence of appropriate

8

instructions on how to complete the turn, the court cannot find that an "about face" turn is evidence of appreciable impairment. *Id.* at 42:2–5, 88:18–24, 116:13–16.

The results of the one-leg stand test suffer from similar issues that reduce its persuasiveness. Morales testified that Cary put his foot down two times, swayed, and hopped twice. *Id.* at 45:8–14. Again, these failures do not establish that Cary was under the influence of an impairing substance beyond a reasonable doubt because Cary (1) stood on the leg connected to his injured hip and (2) moved his airborne foot to point down instead of up to comply with instructions. Morales did not note Cary's injury and testified that he did not recall Cary moving his foot to point down. *Id.* at 58:16–25. However, according to Cary and Byars, Cary told Morales multiple times of his injury (*id.* at 88:1–16, 115:11–19) and moved his foot in the middle of the test to comply with SPC Morales's instructions (*id.* at 88:25–89:2, 116:23–25).

The Government places substantial weight on the fact that, at the police station, Cary refused to submit a breath sample for a breathalyzer test. *Id.* at 75:6–7. This refusal is substantive evidence of driving while impaired. *United States v. Van Hazel*, 468 F. Supp. 2d 792, 798 (E.D.N.C. 2006). However, a refusal to submit a breath sample is only one piece of evidence and it is not given more weight than other pieces of evidence. *See United States v. Rios*, No. 5:12-MJ-01742-JG-1, slip op. at *3 (E.D.N.C. July 17, 2013) ("This evidence [of defendant's refusal to submit to an intoxilyzer test], *together with the other evidence* … establishes beyond a reasonable doubt that [defendant] drove while under the influence of alcohol, an impairing substance." (emphasis added)); *Van Hazel*, 466 F. Supp. 2d at 799 (including refusal to take a breathalyzer test in a list of ten pieces of evidence showing defendant's guilt). Cary's refusal to submit a breath sample is evidence supporting the Government's contention that he was appreciably impaired, but it is not, by itself, dispositive.

9

When considering all of the evidence presented at trial, there is some evidence that Cary was appreciably impaired when operating a motor vehicle, but not sufficient evidence to establish proof beyond a reasonable doubt. Cary has established that he consumed a limited amount of alcohol on the night in question and that he had no alcohol for approximately five and a half hours before he returned to Fort Bragg. There is no evidence that Cary had any difficulty operating his vehicle, providing documentation to gate personnel, or facilitating the search of his vehicle. Gate personnel's observations of Cary are consistent with having consumed alcohol, but they lacked sufficient detail to demonstrate appreciable impairment. Similarly, the SFSTs provide some support for the contention that Cary consumed alcohol, but Cary's overall performance and the manner in which the tests were administered limit the weight accorded to them. Finally, Cary's refusal to submit to an intoxilyzer test does support the Government's case, but that fact is not dispositive. After considering all of the evidence in the record, the court finds that the Government has not proved beyond a reasonable doubt that Cary operated a motor vehicle while under the influence of an impairing substance and, therefore, he shall be found not guilty of the sole count of the Criminal Information.

### III. Conclusion

For the reasons discussed above, the court finds that the Government has failed to show beyond a reasonable doubt that Cary violated North Carolina General Statute § 20-138.1. Therefore, Cary is adjudged not guilty of the sole count of the Criminal Information. The Clerk of Court is directed to close this case.

Dated: March 31, 2016

_Robert T. Numbers II_
Robert T. Numbers, II
United States Magistrate Judge

10

Case 5:15-mj-01010-RN   Document 21   Filed 03/31/16   Page 10 of 10